[Civ. No. 6508. Third Appellate District.—January 15, 1941.]

A. R. O'BRIEN et al., Petitioners, v. CULBERT L. OLSON, as Governor, etc., Respondent.

John L. McNab for Petitioners.

George G. Olshausen, Edward P. Murphy and Samuel J. Jones for Respondents.

THE COURT.—By means of *certiorari*, A. R. O'Brien and other duly appointed and qualified prison directors, seek to review and annul the proceedings instituted under article X, section 1, of the Constitution of California, which resulted in their removal from office by the governor. The respondent moved to quash this proceeding on the ground that the executive act of the governor in dismissing the officers is exempt from interference by the courts for the reason that he is granted by the Constitution exclusive power and authority to do so.

Each of the petitioners was appointed and qualified, for the term of ten years, as a member of the State Board of Prison Directors. The term of none of the directors, with the exception of that of Donald Kolts, has expired. His term ended January 15, 1940. John Gee Clark is the duly appointed Director of Penology of the State of California. As such officer, he filed adequate written charges of alleged "misconduct, incompetency and neglect of duty", against each of the prison directors, on October 23, 1939. The accusation contained eighteen separate specifications of inefficiency. The removal of the directors from office was thereupon demanded. The charges were regularly served upon the officers. The specifications of the complaint accused the directors of: Employing and retaining as warden of San Quentin state prison an incompetent person; the lack of proper supervision of the state prisons; a failure to supply and prepare wholesome food for the use of the prisoners; permitting the maintenance of unsanitary conditions in the prisons; employing dangerous machinery in the jute mills; the lack of adequate medical attention to prisoners; a failure to require entries to be made in

the warden's prison record of corporal punishments administered to prisoners; and of permission granted for prison guards to inflict corporal floggings and cruel and unusual punishment upon prisoners contrary to the provisions of section 681 of the Penal Code.

A motion to dismiss the accusations was denied. The directors filed their answer to the charges denying the material allegations thereof. On November 3, 1939, a hearing of the charges was commenced before the governor sitting in a *quasi*-judicial capacity, as provided by article X, section 1, of the Constitution. The respective parties were separately represented by counsel. The hearing lasted several weeks. Three thousand pages of evidence were adduced. Most of the evidence in support of the charges was supplied by testimony from convicts in San Quentin state prison.

During the hearing of that proceeding, a petition for a writ of prohibition was filed in the Superior Court of Marin County, on December 27, 1939, seeking to restrain the governor from investigating the charges or removing the directors from office. An alternative writ was then issued by the court requiring the chief executive to show cause why he should not be restrained from ousting the members of the prison board. A demurrer to that petition, on the ground that the superior court was without jurisdiction of the persons or subject-matter, and that the petition failed to state facts sufficient to constitute a cause of action, was argued and submitted for ruling on January 11, 1940. Before that demurrer was determined, the respondent in this cause filed his findings April 11, 1940, sustaining most of the material charges which had been preferred against the members of the prison board, and declaring that he would "make an order of ouster at such time, and under such circumstances as may be proper in the premises". June 21, 1940, the judge of the Superior Court of Marin County sustained the demurrer to the petition for a writ of prohibition. For failure to amend that petition within the time allowed, judgment was rendered against the petitioners in the prohibition proceeding dissolving the restraining order, and determining that they take nothing by that action. Subsequently the governor made an order formally removing these petitioners from office as prison directors, and he thereafter appointed their successors. This petition for a writ of *certiorari* was then filed.

■ The respondent contends that the writ of *certiorari* may not issue under section 1068 of the Code of Civil Procedure to review the order of the Governor of California in removing from office the prison directors, since that act was an exercise of executive and ministerial authority which is exclusively within his province. There is no merit in this contention. In the investigation of charges of misconduct and neglect of duty of prison directors the governor clearly acted, under the provisions of article X, section 1, of the Constitution, as an *"officer exercising judicial functions."* (Sec. 1068, Code Civ. Proc.; 4 Cal. Jur. 1071, sec. 38; *State ex rel. Kinsella* v. *Eberhart,* 116 Minn. 313 [133 N. W. 857, Ann. Cas. 1913B, 785, 39 L. R. A. (N. S.) 788.) In the case last cited, which was a proceeding to review the order of the governor of Minnesota in removing from office a county attorney, it is said: "Proceedings for the removal of a public official by the governor are clearly of judicial character". The constitutional provision above cited confers upon the governor, *as an officer,* authority in a judicial capacity to hear and determine written charges of incompetency, as distinguished from his executive power. After authorizing the governor to appoint five prison directors "who shall hold office for ten years", the last paragraph of that section provides that "The governor shall have the power to remove either of the directors for misconduct, incompetency, or neglect of duty, *after an opportunity to be heard upon written charges".*

■ Section 1068 of the Code of Civil Procedure authorizes the issuance of a writ of *certiorari* to review the proceedings of either an inferior tribunal *or an officer* in the exercise of judicial functions. That section provides:

"A writ of review may be granted by any court, except a municipal, police or justice's court, when an inferior tribunal, board, or *officer,* exercising judicial functions, has exceeded the jurisdiction of such tribunal, board, *or officer,* and there is no appeal, nor, in the judgment of the court, any plain, speedy, and adequate remedy."

The respondent insists that the preceding section is inapplicable to the circumstances of this case since the chief executive may not be deemed to be a mere *"inferior* tribunal". That precise contention was disposed of adversely to this respondent in the case of *Harpending* v. *Haight,* 39 Cal. 189, at page 212 [2 Am. Rep. 432], which was a petition for a writ of *mandamus* under section 1085 of the Code of Civil Proce-

dure. That section contains language very similar to the section we are here required to construe. In the Harpending proceeding a mandate was sought and granted compelling the governor to perform the purely ministerial duty of authenticating a statute which had been adopted by the legislature. It was contended, as it is in the present case, that since the governor was not an "inferior tribunal" the writ should not issue against him. But the court held that "It is obvious that the word 'inferior' as here used is a qualification confined to the word 'tribunal' ". The court further explained that the word "inferior" was used in the statute merely to designate the class of tribunals against which the writ may issue as distinguished from the courts which are authorized to issue them. It was specifically said that it had no application to the "person" mentioned in section 1085, against whom the writ may issue. With equal force we may say that the term "inferior", as it is used in section 1068, has no application to the word "officer" against whom it is specifically provided the writ of *certiorari* may issue. It may issue against an *officer* sitting in a judicial capacity, regardless of the station he occupies.

It is true that many authorities have held *mandamus* proceedings will not lie to control the action of a governor in matters which are strictly and exclusively political or executive in their nature. (105 A. L. R. 1124.) On the contrary the authorities from many states, including California, hold that *mandamus* will lie to compel a governor to perform acts which are purely ministerial in their nature and which acts may properly be imposed on other persons or officers. (*Harpending* v. *Haight, supra*; *State ex rel. Kinsella* v. *Eberhart, supra*; *Donnelly* v. *Roosevelt*, 144 Misc. 525 [259 N. Y. Supp. 356]; *State* v. *Frazier*, 47 N. D. 314 [182 N. W. 545, 105 A. L. R. 1132, note].) The same rule applies to a governor when he is acting in a judicial capacity pursuant to the constitutional provision authorizing him to hear and determine charges of unfitness which have been preferred against prison directors. Certainly the trying and determining of charges against a public officer are judicial in their nature. They are entirely separate and distinct from the governor's ordinary executive duties. Such *quasi*-judicial duties might just as well have been imposed on the attorney-general or any other state officer or court. A review of such a separate judicial proceeding in no way infringes upon the exclusive *executive au-*

*thority* which vests in the governor as the chief officer of the state. We are therefore of the opinion the writ of *certiorari* may properly issue under the circumstances of this case.

It is true that the cases in some other jurisdictions are conflicting with respect to the circumstances under which a special writ may issue to compel the governor of a state to perform acts of a purely ministerial nature. (See *Blalock* v. *Johnston,* 180 S. C. 40 [185 S. E. 51, 105 A. L. R. 1115, note].) California is in accord with the decisions of a dozen other states in holding that *mandamus* or any other appropriate writ may issue against the governor under proper circumstances. (*Middleton* v. *Low,* 30 Cal. 596; *Stuart* v. *Haight,* 39 Cal. 87; *Harpending* v. *Haight, supra; Elliott* v. *Pardee,* 149 Cal. 516 [86 Pac. 1087].) If a governor were immune from judicial control under all circumstances merely because he is the chief executive of a state, it is apparent that he might arbitrarily remove public officers for political or personal reasons without just cause, and thereby defeat the very purpose of our democratic form of government. (*State* v. *Verage,* 177 Wis. 295 [187 N. W. 830, 23 A. L. R. 491]; *State ex rel. Kinsella* v. *Eberhart, supra; State* v. *Frazier,* 47 N. D. 314 [182 N. W. 545, 52 A. L. R. 24, note].) In the Kinsella case, *supra,* the court quotes with approval the assertion of Chief Justice Field in *McCauley* v. *Brooks,* 16 Cal. 11, that "No officer, however high, is above the law". In the headnote to the brief found in 52 A. L. R., at page 24, upon the subject of the conclusiveness of a governor's findings of unfitness of a public officer as the basis for removing him, it is said:

"While the courts are very reluctant to interfere with the governor's action in removing a public officer, yet there is authority for the view that, if the officer is not subject to summary removal, but can only be removed for cause for reasons specified in the Constitution or statute, he is not without redress through the courts."

In the brief last cited many cases are enumerated in which the writ of *certiorari* was issued to review the proceedings of governors in removing public officers. We are of the opinion the writ may properly issue under the circumstances of this case to determine whether the Governor, sitting in a *quasi*-judicial capacity, has exceeded his jurisdiction in sustaining the charges which were preferred against the prison directors, and in removing them from office. The situation is governed

by the same rules which apply to the ordinary proceedings for a writ of *certiorari*. (2 Cal. Jur. 1071, sec. 38.)

It has been uniformly held that all officers are amenable to the law. Not even the President of the United States may arbitrarily remove a public officer, unless he holds his tenure at the will of the chief executive. In the frequently-cited case of *Marbury* v. *Madison*. 1 Cranch (U. S.), 137 [2 L.Ed. 60], at page 162, Chief Justice Marshall said:

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. . . .

"The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."

In the case last cited the President of the United States appointed Mr. Marbury as a justice of the peace in the District of Columbia for a definite term of years. His commission was in the custody of the Secretary of State for the mere ministerial purpose of affixing the seal and recording the document when the President's term expired. The succeeding President sought to revoke the appointment of the justice of the peace by directing the Secretary of State not to deliver his commission. Marbury asked for a writ of *mandamus* to compel delivery of his commission of appointment. The syllabi correctly states the principles of law which were decided in that case, as follows:

"The President cannot authorize a Secretary of State to omit the performance of those duties which are enjoined by law.

"A justice of the peace in the District of Columbia is not removable at the will of the President.

"When a commission for an officer not holding his office at the will of the President, is by him signed and transmitted to the Secretary of State, to be sealed and recorded, it is irrevocable; the appointment is complete.

"A *mandamus* is the proper remedy to compel a Secretary of State to deliver a commission to which the party is entitled."

In the case of *Humphrey's Executor* v. *United States*, 295 U. S. 602 [55 Sup. Ct. 869, 79 L. Ed. 1611], the President's

arbitrary removal of a duly appointed member of the Federal Trade Commission, was by a unanimous decision held to be invalid, and a judgment for the commissioner's salary, which accrued after his purported removal from office, was sustained. In that case the Supreme Court of the United States quotes with approval from the Marbury opinion with respect to the remedy of an officer who has been arbitrarily removed without cause by a chief executive. The syllabus of that case also correctly states the principle of law determined, as follows:

"The President's power to remove a member of the Federal Trade Commission is limited to removal for the specific causes enumerated in section 1 of the Federal Trade Commission Act.

"The fixing of a definite term for a public officer, subject to removal for cause, is enough . . . to establish a legislative intent that the term is not to be curtailed in the absence of such cause."

In the present case the term of the prison directors is fixed by law at ten years, and the governor is authorized to remove them only for cause after formal charges have been preferred and sustained in a hearing as provided by the Constitution. The writ of review may be properly directed to the chief executive of a state for the purpose of determining whether he acted in a judicial capacity without or in excess of such authority in examining and determining the charges of unfitness which have been preferred against the prison directors as provided by article X, section 1, of the Constitution.

The respondent contends that the judgment which was rendered in the prohibition proceeding in Marin County is determinative of the issues of this cause in accordance with the doctrine of *res judicata.* We are of the opinion the judgment in the prohibition proceeding is not *res judicata* of the issues presented on this petition for a writ of *certiorari.* The writ of prohibition was sought to restrain the governor from investigating the charges of unfitness of the prison directors and from discharging them on that account. The writ of prohibition will lie only to prevent an inferior tribunal or officer from performing an act not authorized by law. That writ supplies a preventive remedy to restrain the commission of a future act, and not to review an act which has been performed. (*State Board of Equalization* v. *Superior Court,* 9 Cal. (2d) 252 [70 Pac. (2d) 482]; *Traffic Truck*

*Sales Co.* v. *Justice's Court,* 192 Cal. 377 [220 Pac. 306].)
At the time judgment was rendered in the prohibition case
for failure to amend the petition after a demurrer had been
sustained, the governor had not yet completed his investiga-
tion of the charges and he had not then dismissed the prison
directors. Both of those acts were subsequently performed
before this writ of *certiorari* was issued. The writ of *certio-
rari* is authorized for quite a different purpose. It furnishes
the remedy for reviewing the record of an inferior tribunal
or officer to determine whether the acts which have been per-
formed were done in excess of or without jurisdiction.

 A writ of prohibition may not be converted into
a writ of *certiorari* in the absence of adequate pleadings and
a complete record of the inferior tribunal or officer, including
the evidence upon which the acts are actually performed.
(*Donner Finance Company* v. *Municipal Court of the City
and County of San Francisco,* 28 Cal. App. (2d) 112 [81 Pac.
(2d) 1054]; *Van Hoosear* v. *Railroad Commission,* 189 Cal.
228 [207 Pac. 903]; 4 Cal. Jur. 1022, sec. 4.) Since the
acts complained of in this action were not performed when
the judgment in the prohibition case was rendered, that judg-
ment is not *res judicata* of this *certiorari* proceeding.

Assuming that *res judicata* could be successfully pleaded
and proved as an estoppel to this proceeding, which we do
not concede, that fact is immaterial in view of our determi-
nation of the merits of this cause.

 After a careful examination of the record in this case
we are unable to say the respondent exceeded his jurisdiction
in finding that the petitioners were guilty of at least one of
the charges preferred against them, to wit: Authorizing or
failing to prevent corporal punishment of prisoners by the
guards in San Quentin state prison contrary to the provisions
of section 681 of the Penal Code.

While it is true that the respondent found that nine of the
charges were sustained by the evidence which was adduced, he
evidently deemed them to be of slight weight, with the excep-
tion of those which alleged the authorization of corporal pun-
ishment of the prisoners, for he says in his findings: "The
matters which in and of themselves seem to require dismissal
of the board are nearly all bound up with the practice of in-
flicting cruel and corporal punishment within the prison".
We find no substantial evidence of negligence on the part of

the prison board in employing the warden, nor of his incompetency. Nor do we find evidence of negligence on the part of the board in purchasing or supplying food for the use of the prisoners. There is evidence that sour mush was occasionally served to the prisoners and that some other food may at times have been inferior or distasteful. The evidence indicates that those defects occurred from the manner of preparation or from a lack of care in preserving the food, rather than from negligence on the part of the prison board in purchasing the food. Many of the other charges are trivial or lack substantial support of the evidence. They are evidently not strongly relied upon by the governor.

If a single material count, however, is supported by substantial evidence, the governor may not be deemed to have exceeded his jurisdiction in finding the directors guilty of the charges, and we may not then interfere with his conclusions regardless of what we might think of the seriousness of the accusations. There is a conflict of evidence regarding nearly every charge. There is little doubt that some of the prisoners were repeatedly flogged with a rubber hose. There is evidence to indicate this practice continued for more than a year during which time some forty prisoners were flogged. Several prisoners testified to such punishment of themselves and of other inmates of the prison. The guards and other officers testified that the prisoners were flogged only to suppress threatened insurrections or to prevent violent disobedience of prison rules. The guards insisted that the corporal punishment which was administered was necessary to quell riots and to preserve order and control of the institution. It is true that some states authorize corporal punishment of prisoners when it is necessary to preserve discipline and to manage and control unruly and refractory convicts. (*State* v. *Revis*, 193 N. C. 192 [136 S. E. 346, 50 A. L. R. 98].) But the California legislature has prohibited corporal punishment of prisoners in our state institutions under all circumstances. (Sec. 681, Penal Code.)

It is apparent that only strict obedience to stern prison rules can possibly hold control over the eight thousand prisoners in California's two state prisons, many of whom are hardened, desperate, incorrigible criminals. Lax control of desperate criminals will inevitably lead to defiance of authority and mutiny of prisoners so as to endanger the lives of the prison officers and the maintenance of our prison system.

That very situation has occurred in our California state prisons in recent years.

It is true that civilized governments discountenance inhuman treatment of prisoners. In that spirit, section 681 of the Penal Code was enacted to prohibit corporal, cruel or unusual punishment of prisoners. We may not question the wisdom of that statute. It is the law of California, and we are bound to abide by its mandate. There is a distinction, however, between the deliberate infliction of corporal punishment for past offenses, and the use of a rubber hose or other weapon to suppress a threatened riot or to prevent a prisoner from doing bodily harm to an officer or to another inmate of the prison. Clearly the last-mentioned conduct does not come within the inhibitions of section 681 of the Penal Code. The use of weapons under such circumstances is justifiable and necessary. ▊ It was, however, the sole province of the respondent, sitting in the capacity of a judicial officer, under article X of the Constitution, to determine whether the prisoners were flogged with a rubber hose under circumstances constituting corporal punishment in conflict with the statute, or merely for the purpose of necessary control of the inmates. There is evidence to support either conclusion. In applying the foregoing rule regarding the weight of evidence and the credibility of witnesses we are mindful of the fact that each of the directors testified he had no personal knowledge that prisoners were being flogged with a rubber hose, and that he was opposed to the infliction of corporal punishment. We also realize that practically all of the witnesses who testified to such deliberate corporal punishment were prisoners who were incarcerated for felonies committed by them, and that they may therefore be subject to the ordinary rule of impeachment. It is also true that two of the convicts subsequently confessed they had perjured themselves in giving their testimony in that regard. But it is unquestionably the rule, applicable to such investigations, that the judicial tribunal or officer, like a trial jury, has the exclusive province of determining the credibility of witnesses and the weight and sufficiency of their evidence to prove the charges preferred. With that province we may not interfere. It is only when there is no evidence to sustain a charge that a reviewing court may annul a finding of an inferior judicial officer or tribunal on *certiorari*. (*Garvin* v. *Chambers*, 195 Cal. 212, 221 [232 Pac. 696].)

The remaining question to be determined is whether the violation of the corporal punishment statute by the guards may be imputed to the directors so as to justify their removal by the governor. We are pointed to no evidence that any of the directors ever had personal knowledge of the practice of flogging prisoners with a rubber hose. The directors testified that they had no such knowledge, and that they neither authorized nor approved corporal punishment. Yet all of the directors had served as such officers for several years during which time it was their duty to regularly attend meetings of the board at the prisons and to superintend the conduct of those institutions. Since floggings occurred frequently for a period of more than a year, it may be assumed that the directors, in the exercise of reasonable diligence, should have discovered that practice on the part of the guards. We are inclined to hold that constructive knowledge of the practice of flogging the prisoners, under the circumstances of this case, would be imputed to the directors, since the respondent has so found. It has been said "courts are very reluctant to interfere with the governor's action in removing a public officer" where there is any evidence to support the charges either by direct testimony or from reasonable inferences which may be drawn from the evidence adduced. (52 A. L. R. 24, note.) It has been wisely said that courts may not question the motive of a governor in removing a public officer, in the absence of clear proof of an ulterior purpose on his part.

The law confers upon the prison directors general supervision and management of the state prisons. They become responsible for the conduct of the officers therein. The Constitution and the statutes indicate that fact. Section 2 of article X of the Constitution provides that:

"The board of directors *shall have the charge and superintendence of the state prisons,* and shall possess such powers and perform such duties, in respect to other penal and reformatory institutions of the state, as the legislature may prescribe."

Section 5 of the same article provides:

"The legislature shall pass such laws as may be necessary to further define and regulate the powers and duties of the board, wardens, and clerks, and to carry into effect the provisions of this article."

Section 1573 of the Penal Code provides that: *"For the government and management of the state prisons"*, the Gov-

ernor shall appoint five prison directors. Section 1576 of the same code prescribes the duties which are imposed on the directors, including authorization for them to appoint necessary officers and employees of the prison, and to specify the duties which they shall perform. This section also requires that at least three of the directors shall visit the prisons each month, and "oftener if necessary". It compels them to report to the governor "the condition of the prisons" once each year. It also makes it their duty to "prescribe rules and regulations *for the government of the prisons*".

Section 1578 of the Penal Code prescribes the duties imposed upon the warden. Subdivision 3 of that section declares that it is his duty "to supervise the government, discipline and police of the prisons, and *to enforce all orders and regulations of the board* in respect to such prisons".

While the statute does purport to confer upon the warden supervision of the conduct of the prisoners, the various provisions of the Constitution and statutes in that regard must be read together, from which it appears that the warden has supervision, subject only to the paramount authority and control of the board, for section 2 of article X of the Constitution, previously quoted, declares that "The board of directors shall have *the charge and superintendence of the state prisons*". Certainly this gives them authority, and we think it imposes upon them the duty to see that the statute against corporal punishment of prisoners is not violated by guards or employees of the prison, when the members of the board have either actual or constructive knowledge of that unlawful practice.

The petitioners, however, seek to invoke the principle which relieves a superior officer of liability for damages for the torts of a subordinate officer who is engaged in the same public service. (See *Michel* v. *Smith,* 188 Cal. 199 [205 Pac. 113] ; *Noack* v. *Zellerbach,* 11 Cal. App. (2d) 186 [53 Pac. (2d) 986].) Quoting with approval from the Michel case, *supra,* the Noack opinion concisely states the rule as follows:

" 'A public officer is not responsible for the acts or omissions of subordinates properly employed by or under him, if such subordinates are not in his private service, but are themselves servants of the government, unless he has directed such acts to be done or has personally cooperated therein.' The statement is in accord with the rule uniformly followed in other jurisdictions. (1 A. L. R. 222; 3 A. L. R. 149; 12

A. L. R. 980.) In *Hilton* v. *Oliver,* 204 Cal. 535 [269 Pac. 425, 61 A. L. R. 297], trustees of a reclamation district were held not liable for the negligence of subordinates, the court saying (p. 539) : 'The defendant trustees can be held liable under the facts shown herein only by reason of the application of the doctrine of *respondeat superior.* This doctrine has no application as between a public officer and his subordinates who are likewise in the public service, *unless the public officer has directed or countenanced the tortious acts* to be done or has cooperated therein.' (See annotation in 61 A. L. R. 300.) ''

The doctrine announced in the preceding quotation is well established. It will be observed, however, that those cases involved the liability of superior officers for damages for torts committed by subordinate officers engaged in the same public service. Moreover, numerous cases hold that when the tortious acts of subordinate officers are performed under the direction of the superior officer, or even with his acquiescence or approval, he may be held liable. We assume that when such tortious acts are *countenanced* by the superior officers by permitting subordinate officers to repeatedly violate a statute specifically prohibiting the acts complained of, whether knowledge of that practice is actual or constructive, such conduct may furnish grounds for removal of the superior officers for alleged unfitness or neglect of duty, even though they might not be personally liable for damages for injuries sustained.

We are of the opinion the present proceeding furnishes ample evidence distinguishing it from facts which would relieve the directors, as superior officers, from responsibility of the wrongful acts of subordinate officers of the prison under the foregoing rule.

We fully realize the seriousness of the removal of the entire prison board for alleged inefficiency in view of the fact that they have rendered valuable service for the state in that capacity for many years without previous criticism. Upon this proceeding for a writ of *certiorari* we have no discretion except to determine whether the governor, acting in a *quasi*-judicial capacity, exceeded his jurisdiction in determining that any one of the charges is supported by some substantial evidence. We are satisfied there is substantial evidence to support the finding that the board had constructive knowledge,

and therefore became responsible for permitting the guards of San Quentin state prison to administer corporal punishment contrary to law upon many prisoners over a period of several months. We are therefore powerless to interfere with the respondent's discretion in passing upon the charges and dismissing the members of the board.

The order of removal of the officers is affirmed.

A petition for a rehearing was denied February 14, 1941, and petitioner's petition for a hearing by the Supreme Court was denied March 13, 1941. Gibson, C. J., took no part in the consideration or decision of this matter.