[Crim. No. 6799. In Bank. Apr. 24, 1961.]

In re JESSE L. FERGUSON et al. on Habeas Corpus.

Joseph A. DeChristoforo, under appointment by the Supreme Court, for Petitioners.

Stanley Mosk, Attorney General, Doris H. Maier and Richard D. Lee, Deputy Attorneys General, for Respondent.

WHITE, J.—This is a petition in propria persona for a writ of habeas corpus by Jesse L. Ferguson and nine other inmates confined in Folsom State Prison pursuant to judgments, the validity of which is not herein questioned. The petition principally seeks the removal of restrictions placed upon petitioners' claimed religious activities in prison, and the right to communicate with an attorney concerning alleged illegal restraints by the prison officials, unrelated to the judgments of incarceration. Our order to show cause issued, and counsel was appointed to represent petitioners before this court.

According to their allegations, petitioners are members of the Muslim Religious Group. They believe in the solidarity and supremacy of the dark-skinned races, and that integration of white and dark races is impossible since contrary to the laws of God and nature. They appear to be strongly convinced of the truth of their form of what they characterize as a religious belief and in its superiority over other religions. Concerning their relationship to the prison officials, petitioners state that "It is a maxim Dogma and order of our God that we kneel to no one except him. Because we as a religious group do not kneel before some one [who] does not believe in our God."

The general policy of the Department of Corrections is to encourage religious activities by inmates. Some time prior to February 1958, the Director of Corrections considered the question of whether the Muslims should be classified as a religious group. It was determined that they were not entitled to be accorded the privileges of a religious group or sect at that time. Such is the present policy of the Department of Corrections toward Muslims, and this policy was approved by the State Advisory Committee on Institutional Religion in January 1961. Other religious groups are allowed to pursue religious activities, but the Muslims are not allowed to engage in their claimed religious practices.

There appears to be considerable friction between the prison officials and the Muslim inmates as individuals and as a group. On August 16, 1960, two prison officials found it necessary to search two Muslim inmates for contraband. The officials were soon surrounded by approximately 20 of the Muslim group, who manifested much hostility and a desire to protect their two "Brothers" from interference by the prison officials. A number of the Muslims who had gathered were ordered to report to the captain's office where they were questioned. According to the report of a prison official, "All

of those questioned looked down their noses at those present as if we were a very small piece of refuse." At the close of the interview, petitioner Mitchell refused to leave and as an officer attempted to remove him, Mitchell told him "to get his 'stinking hands' off him as no white devil was allowed to put his hands on a Muslim." Mitchell was forced to the floor so he could be handcuffed and removed from the office. Petitioner Johnson thereafter lunged at one of the officers, and he was also forcibly subdued and removed from the captain's office.

On August 21, 1960, petitioner Ferguson attempted to contact a Los Angeles attorney concerning alleged violations of the rights of the Muslim inmates while in Folsom Prison, but it appears that the letter was not allowed to be transmitted to the attorney. Ferguson again sought help on August 28, 1960, by writing to his mother, with directions to take the letter to a specified address. The letter to his mother was also confiscated, and Ferguson was punished for abuse of the mail privilege. In the opinion of the prison officials the letter to his mother contained derogatory remarks about the prison officials. Ferguson stated in the letter to his mother that the prison officials had advised him that his letter to the attorney "Is being returned in your central file, and he is [not] an approved correspondent of yours and you will not be permitted to write to him. The charges you state in your letter are also untrue and we will not permit you to make such statements, criticizing officials of this institution." Ferguson continued: "Now mother what this man forgot, was that this letter I wrote to Mr. Berry. It was legal and he is a lawyer. And I have the right by law to write to a lawyer when it is about law."

It is alleged that in October 1960 and on three subsequent occasions, petitioner Haynes attempted to purchase the "Muslim Bible," the "Holy Qur'an." He was advised that the book had been disapproved by the associate warden, and he was told to refrain from persisting in his efforts to obtain a book that could not be approved. It also appears that a major portion of the Muslim religious literature has been confiscated by the prison authorities. Specifically, it appears that on October 10, 1960, petitioner Ferguson's Muslim religious scrapbook was confiscated by the prison officials when it was found in the possession of inmate Jones. Jones, who is not a petitioner, would not disclose the ownership of the scrapbook, and it was subsequently destroyed as contraband. In his report of the incident the correctional officer stated that "This book consisted of the usual 'Muslim' trash, advocating hatred of the white race, superiority of the black man, . . ."

On November 1, 1960, petitioner Ferguson refused to obey an order given by a prison official. He then grabbed the official by the wrist and necktie, and subsequently he became abusive and belligerent toward other officers in refusing to submit to a routine search of his person. It was necessary to physically subdue him in order to accomplish the search.

Penal Code, section 1473, provides that "Every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint." Penal Code, section 1484, provides that "The party brought before the court or judge, on the return of the writ, may . . . allege any fact to show either that his imprisonment or detention is unlawful, or that he is entitled to his discharge." And section 1485 of the Penal Code provides that "If no legal cause is shown for such imprisonment or restraint, or for the continuation thereof, such court or judge must discharge such party from the custody or restraint under which he is held." Concerning Penal Code, section 1473, the court stated in *In re Rider*, 50 Cal.App. 797, 801 [195 P. 965], that "We think that a person may be said to be unlawfully 'restrained of his liberty,' so as to be entitled to the writ of *habeas corpus*, when, though [lawfully] in custody, he is deprived of some right to which, even in his confinement, he is lawfully entitled under the constitution or laws of this state or the United States, the deprivation whereof serves to make his imprisonment more onerous than the law allows, or curtails, to a greater extent than the law permits even in his confinement, his freedom to go when and where he likes." We stated in *In re Chessman*, 44 Cal.2d 1, 9 [279 P.2d 24], that "The writ of habeas corpus has been allowed to one lawfully in custody as a means of enforcing rights to which, in his confinement, he is entitled." [■■] It thus appears that a writ of habeas corpus may be sought to inquire into alleged illegal restraints upon a prisoner's activities which are not related to the validity of the judgment or judgments of incarceration, but which relate "solely to a matter of prison administration." (*In re Chessman, supra,* 44 Cal.2d 1, 3-4, 5-6, 9.)

Petitioners contend that their rights to religious freedom under the Fourteenth Amendment of the United States Constitution, and that their rights to "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, . . ." under article I, section 4, of the California Constitution, have been denied by the

670

prison officials. They allege that they are not allowed a place to worship, that their religious meetings are broken up, often by force, that they are not allowed to discuss their religious doctrines, that they are not allowed to possess an adequate amount of their religious literature, and that their religious leaders are not allowed to visit them in prison. They allege that Protestant, Catholic, Jewish and Christian Scientist groups are allowed the above-enumerated privileges. Petitioners seek to be permitted religious privileges equal to those allowed to the other prison religious groups, or that religious privileges be denied to all prison religious groups of whatever faith, or, that they be discharged from prison so they may pursue the beliefs and practices of their Muslim faith.

Respondent admits that the above restrictions have been enforced only against the petitioners and other Muslim inmates, but claims that the discriminatory treatment is justified because: ''In the petitioners' case, the Director determined that the principles petitioners allegedly espoused were in direct conflict with the health, safety, welfare and morals of the prison. . . . Petitioners, by their acts in rejecting the authority of members of the white race, displaying verbally and physically their hostility to the prison staff, interfering in the disciplinary proceedings of other inmates and the alleged doctrines advocated, present a problem in prison discipline and management.''

 Freedom of religion is protected as a fundamental right by provisions in the California and United States Constitutions. (U.S. Const., amends. XIV, I; Cal. Const., art. I, § 4.) But whatever may be the guarantees of general religious freedom afforded by article I, section 4, of the California Constitution, it is expressly provided in article X, section 7, of that document that ''*Notwithstanding anything contained elsewhere in this Constitution,* the Legislature may provide for the establishment, government, charge and superintendence of all institutions for all persons convicted of felonies. For this purpose, the Legislature may delegate the government, charge and superintendence of such institutions to any public governmental agency or . . . officers, . . . Any of such . . . officers . . . shall have such powers, perform such duties and exercise such functions in respect to other reformatory or penal matters, as the Legislature may prescribe.'' (Emphasis added.) It is manifest that petitioners are not protected by the guarantees of religious freedom set forth in article I, section 4, of the California Constitution, since they

are incarcerated in an institution for "persons convicted of felonies," and subject to the above exception of article X, section 7. ■■■ Nor does it appear that petitioners may rely on federal constitutional guarantees since, of necessity, inmates of state prisons may not be allowed to assert the usual federal constitutional rights guaranteed to nonincarcerated citizens. (*United States* ex rel. *Morris* v. *Radio Station WENR,* 209 F.2d 105, 107; see *Siegel* v. *Ragen,* 180 F.2d 785, 788; *Nichols* v. *McGee,* 169 F.Supp. 721, 724-725; *Curtis* v. *Jacques,* 130 F.Supp. 920, 921-923.) ■■■ Rather, the United States Supreme Court has recognized that: "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." (*Price* v. *Johnston,* 334 U.S. 266, 285 [68 S.Ct. 1049, 92 L.Ed. 1356]; see also *Tabor* v. *Hardwick,* 224 F.2d 526, 529.) It has been indicated that in cases of extreme mistreatment by prison officials, an inmate of a state prison may obtain relief on federal constitutional grounds. (*United States* ex rel. *Morris* v. *Radio Station WENR, supra,* 209 F.2d 105, 107; *Adams* v. *Ellis,* 197 F.2d 483, 485.) ■■■ But in the instant circumstances, the refusal to allow these petitioners to pursue their requested religious activities does not appear to amount to such extreme mistreatment, so as to warrant the application of whatever federal constitutional guarantees which may exist for the protection of inmates in state prisons. (*Cf. United States* ex rel. *Wagner* v. *Ragen,* 213 F.2d 294, 295; *Nichols* v. *McGee, supra,* 169 F.Supp. 721, 724-725.) We are, accordingly, reluctant to apply federal constitutional doctrines to state prison rules reasonably necessary to the orderly conduct of the state institution. (*United States* ex rel. *Morris* v. *Radio Station WENR, supra,* 209 F.2d 105, 107; *United States* ex rel. *Vraniak* v. *Randolph,* 161 F.Supp. 553, 559-560.)

The California Legislature has implemented the constitutional prison control provisions of article X, section 7, by providing that the "management and control of the State prisons" is vested in the Office of the Director of Corrections. (Pen. Code, § 5054.) Further, Penal Code, section 5058, provides that "The director may prescribe rules and regulations for the administration of the prisons and may change them at his pleasure." It appears that the alleged discrimination against petitioners and the Muslim group respecting their religious activities has occurred pursuant to an order by the Director of Corrections. ■■■ Notwithstanding the fore-

going grant of authority, the orders, rules, or regulations prescribed by the Director of Corrections must be reasonable and not an abuse of his discretion. (See *In re Chessman, supra,* 44 Cal.2d 1, 9; *Davis* v. *Superior Court,* 175 Cal.App.2d 8, 20 [345 P.2d 513].) ▮ However, it is apparent that the Muslim beliefs in black supremacy, and their reluctance to yield to any authority exercised by ''some one [who] does not believe in [their] God,'' present a serious threat to the maintenance of order in a crowded prison environment. Even conceding the Muslims to be a religious group it cannot be said under the circumstances here presented that the Director of Corrections has made an unreasonable determination in refusing to allow petitioners the opportunity to pursue their claimed religious activities while in prison. (See *Akamine* v. *Murphy,* 108 Cal.App.2d 294, 296 [238 P.2d 606].)

▮ Petitioners' counsel contends that the instant determination by this court is ''of necessity, a forerunner to determination of the broader question of whether the preachments of the 'Black Muslims' are such that their activities could be suppressed *outside* of prison.'' It is further contended that if the Muslim beliefs are such as to justify prohibition of mere assembly within prison of the holders of those beliefs, then a corresponding assembly outside of prison could be suppressed. But it is apparent, in view of the provisions of article X, section 7, of our Constitution that the instant determination relates only to the Muslim religious group in prison.

▮ It was contended at oral argument herein that petitioners are only seeking freedom of religious belief, and not the freedom to effectuate their beliefs by action. Even as prisoners, petitioners have the absolute right to possess their Muslim beliefs. (*Cf. Gospel Army* v. *City of Los Angeles,* 27 Cal.2d 232, 242 [163 P.2d 704]; *Ex parte Jentzsch,* 112 Cal. 468, 471 [44 P. 803, 32 L.R.A. 664].) Nor may petitioners be punished for holding their Muslim beliefs. (*Cf. Everson* v. *Board of Education,* 330 U.S. 1, 15-16 [67 S.Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392].) ▮ But assembling and discussing the inflammatory Muslim doctrines in a prison situation must be considered to be such action, even though ''religious,'' which may be reasonably regulated by the Director of Corrections. (Cal. Const., art. X, § 7; Pen. Code, §§ 5054, 5058; *cf.* Cal. Const., art. I, § 4, which reads in part, [''but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State''].)

It has also been contended on petitioners' behalf that the numerous incidents wherein petitioners and other Muslims have been involved in violation of prison rules have been directly caused by the prison officials' refusal to accord the Muslims the status of a religious group, and that if the Muslims were accorded the same privileges as other religious groups in prison, the cause of the friction would be removed. While there may be merit in this contention, nevertheless, in light of the potentially serious dangers to the established prison society presented by the Muslim beliefs and actions, it cannot be said that the present, suppressive approach by the Director of Corrections is an abuse of his discretionary power to manage our prison system. What adjustments should be made to alleviate the present situation would appear to be, at this time, a matter within his discretion. (See Pen. Code, § 5058; *Akamine* v. *Murphy, supra,* 108 Cal.App.2d 294, 296.)

Petitioners contend that they have been subjected to physical force by prison officials solely because of their affiliation with the Muslim movement. They allege that force has been used (1) August 16, 1960, upon the person of petitioner Mitchell, "without just cause," (2) August 16, 1960, upon petitioner Johnson, "without just and proper cause," and (3) November 1, 1960, an assault upon petitioner Ferguson "without any just cause whatsoever." Petitioners also allege that they have been segregated by the prison officials into an old and filthy part of Folsom prison. It is admitted in the return that physical force was used on each of the above occasions, but the respondent warden alleges that the physical force used on each occasion was only that necessary to subdue one or another of the petitioners when he refused to obey proper orders and became violent. It is also admitted that the petitioners were segregated, but only in the normal course of institutional punishment for their violations of prison regulations.

Prisoners may not be subjected to corporal punishment (Pen. Code, § 673) nor, as indicated, may petitioners be punished solely because of their Muslim beliefs. But physical force may be used by prison officials where necessary to prevent a prisoner from doing bodily harm to a prison official. (*O'Brien* v. *Olson,* 42 Cal.App.2d 449, 460 [109 P.2d 8].) It appears that in each of the enumerated instances where physical force was used, one of the petitioners, because of a conflict involving his Muslim beliefs, became physically belligerent and aggressive toward a supervisory official. Since by their aggressiveness petitioners appear to

have created a serious risk of physical harm to the prison officials who had charge of them, the use of physical force by the officials in each of the above-enumerated instances was within the rule of *O'Brien, supra,* so that petitioners have not been subjected to physical force solely because of their Muslim beliefs. It also appears that the segregation of the Muslim petitioners was in the ordinary course of institutional discipline. (See *People* v. *Garmon,* 177 Cal.App.2d 301, 303 [2 Cal.Rptr. 60].) ▮▮▮▮ Furthermore, this court must assume that the prison officials will treat the Muslim inmates as humanely as is possible, considering the difficult administrative problems presented by the Muslim actions and practices. (Code Civ. Proc., § 1963, subds. 1, 15, 33.)

▮▮▮▮ Petitioner Ferguson requests specially that the prison officials be compelled to return his religious scrapbook, which he loaned to inmate Jones from whom it was confiscated on October 10, 1960. Since we have determined that the Muslim Religious Group is not entitled as of right to be allowed to practice their religious beliefs in prison, the "religious" scrapbook must be considered as any ordinary writing advocating or encouraging prohibited conduct. ▮▮▮▮ Reasonable censorship of the printed matter which may be possessed by an inmate is necessary in prison administration (see Pen. Code, § 4570), and is not a denial of fundamental rights. (*People* v. *Ray,* 181 Cal.App.2d 64, 69 [5 Cal.Rptr. 113] ; *Morris* v. *Igoe,* 209 F.2d 108, 109 ; *Adams* v. *Ellis, supra,* 197 F.2d 483, 485.) ▮▮▮▮ In view of the inflammatory nature of the material which petitioner Ferguson's scrapbook appears to have contained, it cannot be said that the confiscation of the scrapbook by the prison authorities was unreasonable. (See *Davis* v. *Superior Court, supra,* 175 Cal.App.2d 8, 20.)

Petitioners particularly urge that the prison authorities be specifically ordered and directed to allow the former to purchase their bible, the Holy Koran. But, as we shall see, it does not appear that they seek the standard Mohammedan scriptures.

As heretofore pointed out, reasonable censorship of the printed matter which may be in the possession of an inmate is necessary in prison regulation and does not impinge upon fundamental rights. Also, we have heretofore set forth the broad delegation of power by our Constitution and statutes which provide that the "management and control of the State prisons" is committed to the office of the Director of Cor-

rections (Pen. Code, § 5054), and the director may not only formulate rules and regulations for the administration of prisons, but, at his pleasure, he may change them (Pen. Code, § 5058). ▉▉▉ Certainly it cannot be said that the prison officials would be acting arbitrarily or unreasonably in withholding a version of any bible or other literature adapted by the Muslim Religious Group to support their doctrines of the supremacy of the black race and segregation from the white race. To so hold would be to compel the prison officials to permit inmates to purchase and disseminate in the prison literature advocating and encouraging the very conduct which the prison authorities may lawfully suppress.

In the case now engaging our attention, the record does not establish that petitioners seek to be permitted to purchase the orthodox Holy Koran, recognized as the scriptures of the Mohammedans and containing the professed revelations to Mohammed, and which is the basis for the religious, social, civil, commercial, military and legal regulations of the Mohammedan world. Nor does it appear that in the requests to the prison officials for permission to purchase their bible, petitioners made it clear to those officials that they were seeking to purchase the orthodox Holy Koran, rather than some version adapted to their ''Black Muslim'' doctrines. Manifestly then, respondent prison authorities cannot be herein directed to comply with petitioners' request to purchase their sacred book when it has not been established that a proper application has been made to the prison authorities thereby enabling them to exercise their discretionary power to manage the prison system. (Pen. Code, §§ 5054, 5058.)

Petitioner Ferguson contends that he has an absolute right to contact a member of the Bar on proper legal business, and that by withholding his communication to the attorney of August 21, 1960, the prison officials in effect held him incommunicado as to any effective vindication of his legal rights. Apparently Ferguson was then attempting to secure counsel to represent him and his fellow Muslims in the prosecution of the instant matter. Respondent does not deny that the foregoing letter to the attorney was not allowed to be delivered, but it is contended that ''the sending and receiving of correspondence within the prison is a privilege and not a right; . . . that inmates may write to . . . attorneys, provided each letter is of proper character and length; that a violation of the rules regarding mail privilege may cause curtailment or suspension of this privilege; . . .'' It was further urged by

respondent at the oral argument that as a prisoner, petitioner Ferguson is generally permitted to contact or procure an attorney by use of the mails, but that no prisoner is allowed to set forth in such a letter to an attorney anything derogatory or critical of the prison authorities. It appears that at this time petitioners, including Ferguson, have communicated with, and had the benefit of appointed counsel through action of this court. Respondent now asserts the right to refuse to permit any of the petitioners, as prisoners, to procure by mail counsel of his own choosing if the letter to the attorney contains matter which is derogatory of the prison authorities.

Even though incarceration in a state prison brings about the loss of numerous legal rights (Pen. Code, §§ 2600, 2601), and the necessary curtailment of freedoms because of incarceration (*Davis* v. *Superior Court, supra,* 175 Cal.App. 2d 8, 20), a prisoner remains "under the protection of the law" (Pen. Code, § 2650). He may not be subjected to "cruel, corporal or unusual punishment" (Pen. Code, § 673; *O'Brien* v. *Olson, supra,* 42 Cal.App.2d 449, 460), "and any injury to his person, not authorized by law, is punishable in the same manner as if he were not convicted or sentenced" (Pen. Code, § 2650). Also, the money and valuables which a prisoner brings into prison must be accounted for upon his discharge. (Pen. Code, § 2085.) Furthermore, a prisoner has a right not to be treated unreasonably considering the circumstances. (*Akamine* v. *Murphy, supra,* 108 Cal.App.2d 294, 296; see *People* v. *Garmon, supra,* 177 Cal.App.2d 301, 303; *Davis* v. *Superior Court, supra,* 175 Cal.App.2d 8, 19-20.)

We stated in *In re Chessman, supra,* 44 Cal.2d 1, 10, that "prisoners have the right to prompt and timely access to the mails for the purpose of transmitting to the courts statements of facts which attempt to show any ground for relief, . . ." and it has been held, as hereinbefore indicated, that a person who is lawfully incarcerated may prosecute a writ of habeas corpus to inquire into a matter which "relates solely to a matter of prison administration." (*In re Chessman, supra,* 44 Cal.2d 1, 3-4, 5-6, 9.) It would thus appear only right and just that a prisoner has a right to prompt and timely access by mail to the courts (*In re Chessman, supra,* 44 Cal.2d 1, 10; *Warfield* v. *Raymond,* 195 Md. 711, 713 [71 A.2d 870, 871]; see *Ex parte Hull,* 312 U.S. 546, 548-549 [61 S.Ct. 640, 85 L.Ed. 1034]; *Spires* v. *Dowd,* 271 F.2d 659, 661; *Haines* v. *Castle,* 226 F.2d 591, 593) though as stated in *In re Chessman, supra,* 44 Cal.2d 1, 10, "it would be manifestly impossible to

allow prisoners 'immediate access by mail to the courts . . . at all times.' "

 It has been held that the right of prison officials to inspect communications between prisoners and their attorneys "should not be used unnecessarily to delay communications to attorneys or the courts since such delay could amount to an effective denial of a prisoner's right to access to the courts." (*Bailleaux* v. *Holmes,* 177 F.Supp. 361, 364.)

 It has also been recently stated that "Of course an absolute isolation of those incarcerated in a penal institution by a ban on communication by them with the outside population would constitute an unreasonable exercise of that power [censorship]." (*Davis* v. *Superior Court, supra,* 175 Cal. App.2d 8, 20.) Further, it is manifest that the right of a prisoner to petition a court for redress of alleged illegal restraints on his liberty is unreasonably eroded if the prison authorities may be allowed to deny a prisoner the opportunity of procuring counsel, so that his petition for writ of habeas corpus or other mode of redress always must be presented in propria persona. It must also be conceded that when a prisoner is writing to an attorney in an attempt to secure legal representation, he must be allowed to set forth factual matters even though derogatory or critical of the prison authorities, since he must persuade the attorney receiving the letter that the writer's rights as a prisoner truly have been violated, so as to interest that attorney in the prisoner's alleged case against the prison authorities. Therefore, it is an abuse of discretion for prison regulations to be utilized so as to deny an inmate the opportunity to procure with reasonable promptness, or to communicate with in a reasonably prompt manner, a member of the Bar on matters pertaining to alleged violations of the prisoner's legal rights allegedly suffered as a direct result of incarceration, even though the letter to the attorney may be critical of the prison authorities.[1] (*Cf. In re Chessman, supra,* 44 Cal.2d 1, 3-4,

---

[1]The instant holding is not contrary to *In re Chessman, supra,* 44 Cal. 2d 1, 9, where it was held that a prisoner has no right to be visited by an attorney who is not his attorney of record. The object of petitioner Ferguson's communication was to secure the services of an attorney. Nor is the instant holding contrary to *Chessman, supra,* at p. 10, where it was held that a prisoner has no enforceable right to engage in legal research. The latter holding in *Chessman* was supported by a reference to Penal Code, sections 2600, 2601, and 2602, which sections deprive persons sentenced to a state prison of their civil rights. It is manifest that Penal Code, sections 673, 2650, 2085, and 1473, all of which sections provide legal rights to a prisoner, are exceptions to the general rules of sections 2600, 2601, and 2602, *supra.*

9-10; *People* v. *Howard,* 166 Cal.App.2d 638, 642-643 [334 P.2d 105] [Prison rules cannot be used to impair an inmate's right to appeal]; *In re Robinson,* 112 Cal.App.2d 626, 629-630 [246 P.2d 982] [Absolute right of inmate to file document with a court relating to judgment of conviction]; *In re Rider, supra,* 50 Cal.App. 797, 801-802 [Superintendent of institution of incarceration may not deny inmate right to privately consult with counsel].)

While the question of the right to engage counsel for the purpose of this proceeding now appears to be moot in that counsel has been appointed and presumably communication to him has not been unduly restrained, this is not to say that these petitioners may henceforth be restrained from communicating, by letter or otherwise, to prospective counsel written in good faith concerning claimed infringements on their legal rights, such as they are.

In view of the foregoing, the petitioners are not now entitled to relief in any respect complained of in the petition. Accordingly, the order to show cause is discharged, and the petition for the writ is denied.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Dooling, J., concurred.