**Thomas COOPER, Plaintiff-Appellee and Appellant,**

v.

**Frank J. PATE, Warden of the Illinois State Penitentiary, et al., Defendants-Appellants and Appellees.**

Nos. 15462, 15463.

United States Court of Appeals
Seventh Circuit.
June 29, 1967.

Edward W. Jacko, Jr., New York City, Robert S. Solomon, Chicago, Ill., for Cooper, Marshall Patner, Chicago, Ill., of counsel.

William G. Clark, Atty. Gen., Thomas D. Decker, Asst. Atty. Gen., for Pate, Richard E. Friedman, First Assistant Atty. Gen., Richard A. Michael, Asst. Atty. Gen., of counsel.

Before SCHNACKENBERG, SWYGERT and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

This case is here for the second time. On the first appeal, this court affirmed judgment dismissing the complaint for

failure to state a cause of action.[1] The Supreme Court reversed, holding that plaintiff Cooper's complaint did state a cause of action.[2]

Cooper averred that he is non-white; that he is incarcerated in an Illinois penitentiary; that he is a follower of the sect of Muslims led by Elijah Muhammad;[3] that defendants, the warden and state director of public safety, have denied Cooper permission to obtain and read certain publications; have denied permission to purchase and read Arabic and Swahili grammar books, from which Cooper hopes to learn to read Islamic works in the original; have denied permission to purchase and read the Koran; have denied permission to consult with ministers of his faith; have refused to allow Cooper and other inmates of his faith to attend religious services in their faith, and have placed him in solitary confinement and in a segregation unit because of defendants' hostility toward Cooper's religious beliefs. Cooper sought a declaratory judgment that defendants' acts violated constitutional provisions and sought an injunction.

After trial, the district judge, the Honorable Richard B. Austin, incorporated findings of fact in a written opinion, and rendered judgment July 23, 1965, favorable in several respects to Cooper. Defendants appealed from certain parts of the judgment, and Cooper from others.

*The problem.* Elijah Muhammad Muslims accept the tenets of "normative" or "historical" Islam,[4] but embrace in addition certain teachings of Elijah Muhammad of Chicago (whom they consider also a messenger of Allah) which have no counterpart in normative Islam. These additional teachings include an account of creation according to which the black man was the original man and the white race the product of experiments in genetics. The teachings include the propositions that the white race is a race of devils, the enemies of Allah; that the white man will be punished for what he has done to American negroes; that Allah permitted the white race to rule for 6,000 years, but the time has now expired; and that black people must separate from white people.

Defendants permit prisoners of other faiths to communicate with spiritual advisers, and they arrange for worship services for eight religious groups. Indeed, Illinois statutes require admission of clergymen of all denominations to visit inmates, and require the warden to permit ministrations of religion according to the ceremonies of the respective churches.[5] Cooper, an Elijah Muhammad Muslim, desires the same privileges as are available to those of other faiths.

Defendants, as administrators responsible for the safety of inmates, as well as the success of rehabilitation efforts, and the like, are apprehensive about the presence and effect of the racial doctrines of the Elijah Muhammad Muslims. Stateville, the Illinois penitentiary involved, has 4,700 inmates, negro and white. It is a maximum security prison where the highest degree of immaturity, resentment, irresponsibility, despair, and lack of self control are virtually entrance requirements.[6]

Defendants would justify their prohibition of religiously-motivated activities of Elijah Muhammad Muslims as efforts, in the interest of safety, to prevent the

1. Cooper v. Pate (7th Cir. 1963), 324 F. 2d 165.

2. Cooper v. Pate (1964), 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030.

3. This group is sometimes referred to as "Black Muslims"; we will refer to it in this opinion as the Elijah Muhammad Muslims.

4. The faith of those who accept Muhammad of seventh century Mecca as the last messenger of Allah.

5. Ill.Rev.Stat.1965, Ch. 108, secs. 50, 51.

6. Cooper himself, though his testimony reflects considerable mental agility, is serving two consecutive 100-year terms for murder, and the record contains much evidence of his acts of dangerous violence.

nurture and spread of such beliefs within the prison, and to avoid explosive impact of these beliefs on those who find them abhorrent. Defendants' concern is understandable. Racism in any form would be dangerous in a crowded, racially-mixed prison. When racism is an article of religious faith, the danger is undoubtedly greater.

■ *The legal principles.* Defendants have not argued that the beliefs of Elijah Muhammad Muslims do not constitute a religion. A determination that they do not would be indistinguishable from a comparative evaluation of religions, and that process is beyond the power of a court.[7]

■■ It is the general rule in cases where a state court is asked for relief from practices in a state prison, or a federal court in a federal prison, that the court will not interfere with the discretion of the prison administrators.[8] Here the federal court is asked to give relief against the administrators of a state prison. It is asserted that the prison authorities have so greatly impaired Cooper's federally-protected freedom of religion as to give rise to a cause of action under 42 U.S.C. § 1983. But although the deference to administrative discretion is not as complete in a case like the present, weight is still given to the judgment of the administrators in determining the practices which are necessary and appropriate in the conduct of a prison.

■■ It is clear that prison authorities must not punish a prisoner nor discriminate against him on account of his religious faith.[9] But although a prisoner retains his complete freedom of religious belief, his conviction and sentence have subjected him to some curtailment of his freedom to exercise his beliefs.[10]

■ Courts will closely scrutinize the reasonableness of any restriction imposed on a prisoner's activity in the exercise of his religion, and specially so where the adherents of one faith are more heavily restricted than the adherents of another.[11]

With the foregoing general principles in mind, we proceed to consider the several parts of the judgment.

1. *The Koran (Quran).* Defendants were "enjoined from refusing to plaintiff and other followers of Elijah Muhammad permission to purchase English-language translation of the Holy Quran, including the Mulana Muhammad Ali Edition." Defendants have not appealed from this decree.

2. *Communication and visiting with ministers.* Defendants were "enjoined from refusing to plaintiff and other followers of Elijah Muhammad permission to communicate by mail and visit with ministers of their faith, subject to prison rules and the conditions specified in the

7. Fowler v. State of Rhode Island (1953), 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828; State v. Cubbage (Super.Ct.Del.1965), 210 A.2d 555, 562; Fulwood v. Clemmer (D.D.C.1962), 206 F.Supp. 370, 373.

8. Sewell v. Pegelow (4th Cir. 1961), 291 F.2d 196, 197; Childs v. Pegelow (4th Cir. 1963), 321 F.2d 487, 489, cert. den. (1964), 376 U.S. 932, 84 S.Ct. 702, 11 L. Ed.2d 652; Fulwood v. Clemmer, supra footnote 7, 206 F.Supp. at 375; Desmond v. Blackwell (M.D.Pa.1964), 235 F.Supp. 246, 247.

9. Cooper v. Pate, supra footnote 2; Sewell v. Pegelow, supra footnote 8; Sostre v. McGinnes (2d Cir. 1964), 334 F.2d 906, 908, cert. den. (1964), 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96; In Re Ferguson (1961), 55 Cal.2d 663, 12 Cal.Rptr.

753, 361 P.2d 417, 422, cert. den. (1961), 368 U.S. 864, 82 S.Ct. 111, 7 L.Ed.2d 61; Desmond v. Blackwell, supra footnote 8; Jones v. Willingham (D.Kan.1965), 248 F.Supp. 791.

10. Childs v. Pegelow, supra footnote 8, 321 F.2d at 490; Sostre v. McGinnes, supra footnote 9; Cooke v. Tramburg (1964), 43 N.J. 514, 205 A.2d 889, 891; Desmond v. Blackwell, supra footnote 8; Long v. Katzenbach (M.D.Pa.1966), 258 F.Supp. 89, 92.

11. Pierce v. La Vallee (2d Cir. 1961), 293 F.2d 233, 235; State v. Cubbage, supra footnote 7; Fulwood v. Clemmer, supra footnote 7. Probably contra, In Re Ferguson, supra footnote 9, 55 Cal.2d 663, 12 Cal.Rptr. 753, 361 P.2d at 421.

Memorandum Opinion." The court's memorandum opinion included a direction to defendants to "implement rules and regulations consistent with this opinion." The opinion noted that "Ordinarily the regulation of the mail and visitation privileges of prisoners is a matter within the administrative discretion of prison officials," that inmates are usually allowed to write to and be visited by their minister at home or a personally-known minister, and that communication between Elijah Muhammad Muslim inmates and ministers of that faith "should be allowed within allowable limitations and in conformity with prison practices including usual and generally applicable censorship."

The court found that defendants had not shown that such communication "presents a clear and present danger to prison security." If the clear and present danger standard is the correct test, the district court was clearly correct in finding that communication and visiting had not been shown to pose such danger. Moreover, the denial of the privilege of such communication to adherents of one faith while granting it to others is discrimination on account of religion.

3. *Religious services.* Defendants were "enjoined from refusing to plaintiff and other followers of Elijah Muhammad permission to attend religious services conducted by a recognized Muslim or Islamic minister, subject to prison rules and the conditions specified in the Memorandum Opinion."

In the memorandum opinion, the court noted that any right to attend a service must not interfere with regular prison routine and that it is not administratively feasible to provide regular services for each and every religion. "Should a recognized Muslim or Islamic minister make his services available to the prison, however, and space and normal prison routine permit, those who sincerely believe in these faiths should be allowed to attend any service he shall conduct." The court also emphasized that it is within the discretion of the authorities to control any rights granted, to select the time and place, the number of persons permitted to attend, and the number of guards necessary to maintain order and discipline.

The court considered that categorical denial to Elijah Muhammad Muslims of the right to attend organized religious services conducted by a recognized minister of their faith while granting this right to other religions would be religious discrimination. We agree.

There is considerable evidence in the record that other prison administrators would agree with defendants that it is good policy not to permit Elijah Muhammad Muslim worship services, that there have been violent occurrences in institutions where such services are permitted, and it is clear that Elijah Muhammad Muslims account for many more infractions of discipline per capita than the prison population in general.

The problem should not be minimized. Defendants, however, have not tried the course of permitting worship services for this group under regulation. Such course is apparently followed at some institutions. Although Cooper and other Elijah Muhammad Muslims at Stateville have been serious disciplinary problems, there are other prisoners of their faith who have not been.

The district court found that there are less drastic and less sweeping means of achieving necessary control of such group services than categorically banning them. In part that is a finding of fact, and in part a recognition that discrimination in treatment of adherents of different faiths could be justified, if at all, only by the clearest and most palpable proof that the discriminatory practice is a necessity. Proof which would be more than adequate support for administrative decision in most fields does not necessarily suffice when we are dealing with the constitutional guaranty of freedom of religion, and with an exercise of religion so widely considered essential as worship services.

One statement in the memorandum opinion requires comment: "If individuals of any sect have past records

of prior misconduct, it is within the discretion of authorities to exclude them from any services." We interpret this statement as limited to past misconduct which reasonably demonstrates a high degree of probability that the individual would seriously misuse the opportunity for participation with the group. A broader interpretation would be too broad.

4. *Newspapers and publications.* Plaintiff's complaint stated that he had been denied permission to purchase and read certain newspapers and publications, although other prisoners "are allowed to read the newspapers and news publications of their choice." Defendants answered that prisoners may read only those newspapers and other publications which are approved by defendants as being compatible with institutional goals, and which are requested by the prisoner in the manner designated by prison authorities.

The district court found that plaintiff had not shown that these publications were basic to his belief or understanding of religion and had not sustained his burden of showing that the censorship was an abuse of discretion. The court dismissed the complaint on this point, and plaintiff appealed.

■ This was not the point given principal attention on the trial, and the record is not as clear as it might be. Apparently some of these publications carry articles by Elijah Muhammad and some relate otherwise to matters of faith. Viewed as ordinary reading matter, with only slight relevance to religion, it would be most difficult to establish that exclusion of any such material from a prison is unlawful. Considered as religious material, one question would be whether material of the same degree of religious relevance is permitted prisoners of other faiths. And the extent or tone with which the race doctrine of this particular faith is emphasized would, we think, be a legitimate consideration.

■ On the record before us, we cannot say that the finding of the district court was clearly erroneous.

5. *Grammar books.* Plaintiff's complaint stated that he needed Arabic and Swahili grammers in order to study Islamic works. He claimed that other prisoners are permitted to buy books in order to study a foreign language.

■ The district court found that these books are not necessary for the practice of Cooper's faith, and that they were denied him because of staff and facility limitations. Apparently the court had in mind the fact that the prison does offer foreign language instruction. Plaintiff, however, was seeking an opportunity for self instruction in a language of his choice. In our view, the record does not establish the impairment of a constitutional right (religious or otherwise) in this area.

6. *Segregation.* Plaintiff has been separated for many years from the general prison population. He is held in the segregation unit, where he cannot mingle with other prisoners and enjoys fewer privileges. As we understand the practice at Stateville, close confinement as punishment for infractions comprises terms of a specified number of days in "isolation." A prisoner is held in the segregation unit, however, as a result of a more far reaching determination that he is unsuitable for mingling with the general prison population. He remains in segregation for an indefinite period until the warden determines that he may again be suitable to mingle with the general population.

Cooper's stay in segregation is almost of record length. He arrived there in 1957 after a term in isolation for attacking prison guards. He was out briefly in 1959, but was returned after a similar outbreak, and has remained.

■ The complaint states that defendants hold him in segregation because of their hostility to his religion. The district court found that his confinement "is for normal disciplinary reasons and not because of any religious beliefs he may hold." Testimony, partly disputed by Cooper, describes various episodes in which he was violent and vicious. There is other testimony that he expressed the

**524**

preference on several occasions to continue in segregation. The finding of the district court on this point is not clearly erroneous.

During the trial the warden said that he would consider a letter from Cooper requesting release from segregation. After the trial plaintiff did write a letter, but was not released. He moved to amend the findings and judgment so as to require defendants either to release him from segregation or to issue rules for obtaining release. The court denied the motion and Cooper has appealed from the denial.

The district court having found that Cooper's detention in segregation is not on account of his religion, the record before us at this time does not show that the refusal to codify standards for release nor the refusal to release upon receipt of the letter is a deprivation of any federally-protected right.

It is argued here that since a prisoner is not permitted to attend religious services while in segregation, keeping him in segregation is itself a deprivation of religious freedom. This appears to be a new argument on appeal, not litigated in the trial court, and inappropriate for our consideration.

The judgment is

Affirmed.