THE STATE OF DELAWARE on the relation of Walter H. Tate, John Weddington, David Sanders, Eron Davis and Pierce Johnson, Plaintiffs-Relators, v. HAMMOND CUBBAGE, Chairman, Sidney Balick, Karl K. Brown, George Ehinger, Thomas W. McKenna, Frank S. Parker, and C. Arthur Taylor, being and constituting the Delaware State Board of Corrections,[1] Harry W. Towers, Acting Director of Corrections and Raymond Anderson, Warden, New Castle Correctional Institution, and State of Delaware,[2] Defendants-Respondents.

---

[1] When this action was filed, the prisons of this state were conducted, as provided by Vol. 50 Del. Laws, Ch. 486, enacted in 1955, under the management and supervision of the State Board of Corrections. In July of 1964 the direction of such institutions, by virtue of the provisions of Vol. 54 Del. Laws, ch. 349, came under Department of Corrections. Both statutes relate to Title 11 *Del. C.,* Ch. 65. 11 *Del. C.,* Sec. 6502, as amended by 54 Del. Laws, Ch. 349, provides that—

"* * *. References in other statutes to the State Board of Corrections * * * shall be deemed to mean the Department."

Section 1 of 50 Del. Laws, Ch. 486 (11 *Del. C.,* Sec. 6501) provided that the Board of Corrections "is completely responsible for the care, administration and supervision of the detention and correctional services and facilities of the State in order that these services and facilities may be most effectively and efficiently utilized for the rehabilitation and restoration of offenders to the

---

[2] The State of Delaware has been eliminated as a party defendant by stipulation of counsel.

community as useful law-abiding citizens."

11 *Del. C.,* Sec. 6501, as amended by 54 Del. Laws, Ch. 349, provided that the purpose of this Department of Correction shall be "the treatment, rehabilitation and restoration of offenders as useful, law-abiding citizens within the community. To achieve this more effectively in a coordinated and united manner, the Department of Correction shall be completely responsible for the maintenance, supervision and administration of adult detention and correctional services and facilities of the State, which include institutional facilities and probation and parole services. * * *."

Title 11 *Del. C.,* Sec. 6504, as amended by 54 Del. Laws, Ch. 349 provides:

"There is established a Department of Correction. Said Department shall be a continuation of and successor to the State Board of Corrections hereto existing."

Title 11 *Del. C.,* Sec. 6505, as amended by 54 Del. Laws, Ch. 349, *inter alia, provides:*

"Sec. 6505 GENERAL POWERS AND DUTIES OF THE DEPARTMENT

"(a) The Department, * * * shall have * * * the exclusive jurisdiction, and supervision of

"1. All offenders and persons under the custody of the Department of Correction."

Title 11 *Del. C.,* Sec. 6506, as amended by 54 Del. Laws, Ch. 349, provides:

"There shall be a Board of Correction of nine members appointed by the Governor, * * *. The present members of the State Board of Corrections shall constitute and continue as members of the Board of Correction until their terms expire."

Title 11 *Del. C.,* Sec. 6513, as amended by 54 Del. Laws, Ch. 349, provides in part:

"The Board shall be the general policy-making authority for the Department, not its administrative or executive head, but the administrative or executive head shall be responsible directly to the Board which shall have such other duties as are granted in this Act. * * *."

Title 11 *Del. C.,* Sec. 6515, as amended by 54 Del. Laws, Ch. 349, provides:

"Sec. 6515. OFFICE AND APPOINTMENT

"The office of Commissioner of Correction is created. He shall be appointed by the Board for an indefinite term at the pleasure of the Board, but shall be removed only for cause. The salary of the Commissioner shall be as fixed by the Board. * * *."

Title 11 *Del. C.,* Sec. 6516, as amended by 54 Del. Laws, Ch. 349, provides:

"Sec. 6516. COMMISSIONER IN CHARGE

"The Commissioner is in full and active charge of the Department, and of its facilities and services and is the Chief Executive and Administrative Officer of the Department."

Title 11 *Del. C.,* Sec. 6517, as amended by 54 Del. Laws, Ch. 349, provides, in part, as follows:

"Sec. 6517. DUTIES AND RESPONSIBILITIES OF THE COMMISSIONER

"(a) The Commissioner shall carry out and provide:

"1. For promulgating rules and regulations to carry out his duties and operate the Department which shall not be inconsistent with the general policies of the Board.

"2. For the organization, maintenance, control and operation of the Department.

"3. For the custody, study, training, treatment, correction and rehabilitation of persons committed to the Department.

"4. * * *.

"5. For the administration, supervision, operation, management, and control of State correction institutions, farms, or any other institution or facility under the jurisdiction of the Department.

"* * *.

"11. For managing and supervising the Department and doing any and all things necessary to carry out and to fulfill the purposes of this Chapter."

*(May 7, 1965)*

LYNCH, J., sitting.

*Howard M. Handelman,* for relators.

*B. Wilson Redfearn,* Deputy Atty. Gen., for respondents.

Superior Court of Delaware for New Castle County, No. 3098 Civil Action, 1964.

LYNCH, Judge.

Relators, inmates of the New Castle Correctional Institution[3] belonging to a group which is commonly known as the "Black Muslims," filed an application for a Writ of Mandamus on June 19, 1964, naming as respondents those persons set forth above in the caption.

Basically, relators (1) claim that the Black Muslims are a religion, and that they have been denied their right to practice their religion at the N.C.C.I.; and (2) that because of their particular religious beliefs they have been discriminated against as inmates of the N.C.C.I.

Respondents have waived all technical objections to the means

---

[3] Referred to hereafter as N.C.C.I. It was opened November 4, 1901; since then it has been altered and enlarged so that it can accommodate approximately 700 inmates.

by which the questions were brought before the court by relators. Respondents have further waived any objections which might exist because of a possible technical failure on the part of the relators to exhaust their administrative remedies before bringing this suit. Respondents' position is (1) that the teachings and beliefs of the Black Muslims is not a religion; (2) that they have not been deprived of any constitutional rights relating to their beliefs or the practice of their beliefs, if the court finds such beliefs are a religion, and (3) that relators have not been discriminated against because of their particular religious beliefs.

From the testimony adduced by both sides in the course of six days of hearings, I find that there are approximately 350 to 400 inmates at the main building of the N.C.C.I. The number of Black Muslim inmates at the main building of N.C.C.I. varies, but their number never exceeds 20.

For many years two religious services have been and still are regularly conducted on each Sunday at the N.C.C.I. One such service is for the Catholic inmates and the other is for the non-Catholic or Protestant inmates. These religious services have been held each Sunday in the recreation hall of the N.C.C.I., beginning at 8:15 A.M. and ending at 10:15 A.M. The rules and regulations of the State Board of Corrections provide that "Inmate Bible Classes will be conducted under the leadership of Chaplains." The Protestant Chaplain has conducted Bible classes for non-Catholic or Protestant inmates and the Catholic Chaplain has conducted such classes for the Catholic inmates.

Catholic and Protestant inmates receive religious literature, in accordance with the rules and regulations of the State Board of Corrections, which allow inmates to receive newspapers and magazines of a religious nature, which are on an approved list. The testimony was that the only list of approved literature in existence was for magazines; by implication seemingly there are no newspapers on any approved list. Relators have not been permitted to receive "Muhammad Speaks," represented to be the "official newspaper of the Black Muslims in America." Relators made no showing that they ever applied to have this

paper put on the approved list.[4] Copies were received in evidence. Relators have been permitted to receive and keep their Koran or Quran, which is their Bible.

Catholic and Protestant inmates have been permitted to have in their possession and wear religious symbols, such as crosses and medals; on the other hand, members of the Black Muslim group have not been permitted to have and wear "crescents"—which they say is their religious symbol—nor have they been permitted to wear certain pieces of clothing which they claim have certain religious significances.

The State Board of Corrections had no rules or regulations governing the wearing of clothing or religious symbols at the time the difficulties arose which provide the background of this litigation. On May 26, 1964 regulations were adopted which prescribed a uniform for inmates of the N.C.C.I. These regulations did not apply or relate to the possession and wearing of religious symbols. Since the hearings have been completed pertinent regulations have been adopted by the Department, relating to possession and wearing of such medals, crosses and religious symbols.

Minister Carl X. Hardin, the Black Muslim Minister in Wilmington, testified for relators. He stated that the Black Muslim religion encompasses the same religious belief as practiced and believed in by over 315 million people throughout the world known as Mohammedans. As such they believe in the Holy Koran 100%. They claim belief in Mohammedism and in its principles, including its concept of God or the Supreme Being. This witness conceded the Black Muslims teach a type of black supremacy or black superiority based on teachings of one "Honorable Elijha Muhammed;" that it is one of his teachings that an injustice has been committed upon the black man in America and that those persons who have been and are guilty will have

---

[4]This court will not act to decide if this publication should be placed on the approved list until the Department of Corrections has considered the matter. The court has no inherent censor powers; it can review the correctness of the Department's decision, if called upon.

to pay for what they have done; that the black race was more righteous than the white race and thus that they were a superior race; that because of such superiority there will be a separation of the races in the near future.

Minister Hardin testified further that the religious and economic aspirations of the Black Muslims are as may be found in "Muhammed Speaks," copies of which are in evidence; that while "Muhammed Speaks" contained many other matters, it was basically a religious pamphlet. This witness likewise identified a copy of a book entitled "The Supreme Wisdom," which contains the religious teachings of the Honorable Elijha Huhammad, and he testified that the book "The Supreme Wisdom" is an explanation of the Scripture and contains God's own teachings; the teachings of the Black Muslims are that white men are all bad and are all liars, and that the white people have gone to the limit in doing evil, and thus there will be a general insurrection of the black people before the year 1970. He further testified that the Nation of Islam, as identified and practiced by the Black Muslims in America, was the same as the historic religions of Islamism, practiced by the other Mohammedans throughout the world.

Respondents, on the other hand, contend that these various documents, many of which are in record, and the book 'The Supreme Wisdom" speak for themselves and that they are highly inflammatory and I so find.

Dr. Schacht, Department Head from Columbia University, and a notable authority in the field of Oriental Religions, testified for respondents. He stated there are extensive and basic differences between the teachings of the two groups, i. e. the Mohammedans and Black Buslims. I find, therefore, that such religion as taught by the Black Muslims is not the same as has been and is taught by Mohammedans generally. I find that these two religions are incompatible, except for a given acceptance by the Black Muslims of what is taught in the Koran or Quran. It clearly appears to me that the teachings of those who are Black Muslims is heretical insofar as the Mohammedan faith is concerned.

Petitioners sought permission on June 7 and 8, 1964 to worship separately in the manner followed by their teachings and apart from other faiths. The request was made through the Institution's Chaplain. The Chaplain testified that all religious exercises are held on Sundays in the recreation hall, described by him as "the only place that we have for religious services." He further testified:

"For years we have had ministers, even before my time as chaplain, they have had ministers coming from various groups, as I said, the Methodists and the Baptists, and the Pentecostal, and the Lutherans, and the Assembly of God, and several denominations, some of them coming for years, and the Salvation Army comes the first Sunday of every month, and we have arranged it so. I have taken it on myself to try to get groups of men that we have in there; that is, we have a Baptist, we want a Baptist there, a Baptist minister there; and the Pentecostals, and whatever denomination, we try to arrange to have a minister there to hear them, or on two Sundays or maybe three Sundays a year."

He also testified:

"Q  I understand that you say that you turned him down because your list had already been made up for the year. Is that correct?

"A  That is right.

"Q  I understand also that you say that you had turned down other people from the outside for the same reason. Is that correct?

"A  That is right."

I therefore, find that the decision of the Chaplain, accepted by the respondents, was based on prior practice and his conception of available facilities at the N.C.C.I. I am convinced that it was not discriminatory in nature or made because relators are Black Muslims. Nonetheless, as noted hereafter, principles of the Equal Protection

clause are pertinent and must be considered in the determination of this case.

Relators professed to not believe in violence; they further professed to believe in submission to prison authority. I find against relators on these points.

While the Black Muslim group, and specifically the relators, claimed to be a non-violent group, one witness was in a fight with one of the Muslims when he mentioned that there was only one Savior and that was Jesus Christ and I am convinced that some or all relators engaged in their Black Muslim activities in a course of conduct which made threats of violence in certain instances and under certain circumstances. Although there is no evidence in the record of these proceedings indicating that the relators' religious activities or practices resulted in their being reprimanded or disciplined, there is evidence in the record that the petitioners were not always cooperative on the religious issue. Then, too, there is evidence—and this is disturbing—tending to show that the Black Muslim group congregated daily in the yard of the N.C.C.I.; that this group was growing in number and meeting more frequently; that complaints were made by other inmates of the actions, conduct and statements made by this Black Muslim group, including some of the relators. This evidence is such that I feel I should not find this group ever created any disturbance as such, although their actions and conduct did affect and disturb the other inmates at the N.C.C.I., so as to create some disciplinary problems.

At their meetings the Black Muslim group discussed, among other things, the following:

(a)   The Muslims are entitled to a separate state to be given to them by their "white American-slave masters."

(b)   All believers of Islamism now in Federal Prisons should be released.

(c)   All Black Muslims in America should be exempt from taxation.

(d)   The Black Muslims want a territory of their own.

(e)   The United States should provide all books and equipment, schools and school buildings free to the Black Muslims.

(f)   That the Bible has been tampered with.

(g)   That the black people are the chosen people of God.

(h)   A judgment will take place in America as God has revealed.

(i)   Black Muslims were considered "free slaves."

(j)   Muslims should not participate in wars.

The teachings and preachings of the Black Muslim group at the N.C.C.I. included and seemingly also went beyond the precepts mentioned above. I am convinced that relators approached other inmates and talked to them about "black supremacy, the white man as a devil, that we should all stick together and love our brother the black man, and that the white man is the one who caused us to be low rated as a race of people;" that in a certain number of years the white man would be suppressed and that the black man, who had the knowledge of Elijha Muhammad, would take over. The Black Muslim group, including some of the relators, talked often in the yard and on the tiers of the cell blocks; that at times they talked at the tops of their voices and preached with great emphasis; some witnesses testified that the Black Muslims had never been known to discuss prayer or virtue of brotherly love of any sort—seemingly limiting such discussions to their political, social and economic aspirations.

One of the guards testified that it was his opinion, after talking to approximately 100 inmates, that it was the consensus of the inmates at the workhouse that violence or danger would erupt if the Black Muslims were allowed to continue along the present lines and preach the present doctrines. An inmate at the N.C.C.I. testified that the noise made by the Black Muslims, when they were discussing their religion,

bothered him; this witness said that he heard the Black Muslims in their discussions at the N.C.C.I. refer to the white man as the "devil" and say that the white man had brain washed the negroes; that the substance of the Black Muslims' doctrine, as preached at the N.C.C.I., was the supremacy of the black man and hatred of the whites.

Another guard testified that he had talked with the relators regarding their religion and, among other things, he had heard them state that there should be complete separation of the negro from the white man; that the negro was discriminated against in general; and that if it took violence to put across the Black Muslim message, the Black Muslims said that they would use. it. This witness also mentioned that he heard the Black Muslim group refer to white man on many occasions as the "White Devil" and that it was his opinion that there may well be danger because the Black Muslims did not feel that they had to abide by the laws of the country and that thus they could not abide by the laws of the institution.

Other witnesses testified that there would be violence in the institution and there would be fighting if these Black Muslims were allowed to continue in the preaching of their religion, and I so find for respondents on these points.

Two witnesses—heads of penal institutions from out of this state, and with considerable experience regarding penal institutions—discussed the problems which they had had with the Black Muslims in their particular penal institutions, and both men were of opinion, after observing the physical set up and plant of the N.C.C.I., that the security of the prison was jeopardized by the teachings and actions of the Black Muslims at the N.C.C.I., and could lead to problems of discipline there.

The Director of Institutions testified unequivocally and most impressively that he had never disciplined anyone or ordered the disciplining or harrassment of anyone on the basis of their religious beliefs; that he neither disciplined any person on the basis that they were Black Muslims, nor permitted discipline of such persons for such

reasons; he did not object to the religion of Islam; his position is that everyone should be treated the same. No credible testimony to the contrary was tendered by relators.

This witness conceded that he told the Warden of the N.C.C.I., that the inmates could not wear hats and bracelets with Black Muslim indicia, such as crescents, regardless of to whom they belonged, giving as his reason that these items were not part of the prison uniform.

The Warden of the N.C.C.I. testified that he had never disciplined anyone nor ordered anyone to be disciplined or harassed because they were a member of any religious sect, and particularly of the Black Muslim faith; this testimony of this witness was not contradicted. The Warden, like the Director of Institutions, stated he had no objection to the Koran or the other religious publication of the Black Muslim, but he objected to the preaching of hate by the Black Muslims, and objected to the Black Muslims preaching their particular doctrines in various places—other than at religious meetings—at the N.C.C.I., since it was his opinion there would be trouble if the Black Muslims did not stop their preaching, since their preachings were objectionable to the white inmates.

A guard at the N.C.C.I., who was in charge of the "yard" at the institution—where all inmates had their out of doors recreation—testified he gave only such attention to what the Black Muslims were doing as required him to do his job, but he stated—somewhat emphatically—that he did not pay any particular attention to what the Black Muslims were doing, over and above other groups, nor was he told by the Warden to pay particular attention to this group.

I find generally for respondents on all issues—especially on the charges that relators were discriminated against merely because they are Black Muslims—and except where my findings have been specifically to the contrary. The matters relating to relators' not being permitted to "practice their religion" is something else, as noted above at pages 9 and 10.

## CONCLUSIONS OF LAW

1. Relators have not proven, by a preponderance of the evidence, that respondents have discriminated against relators at the N.C.C.I. because of their particular religious beliefs, except (a) the respondents have not provided equal facilities for relators to have their religious services, as have been extended to Catholic and Protestant inmates, and thus have denied the relators "equal protection of the laws," and (b) to the extent it was shown that respondents have permitted Catholic inmates and Protestant inmates to wear indicia of their religious belief, i. e. crosses and medals, while denying to relators the right to wear the "crescent," as an indicia of their religious beliefs, respondents have denied the relators "equal protection of the laws."

2. Relators have not proven, by a preponderance of the evidence, that respondents have deprived relators of any constitutional rights regarding the practice of their religious beliefs, except to the extent as is noted in Conclusion of Law No. 1.

## OPINION

In an address delivered to the American Correctional Congress, on August 27, 1963, at Portland, Oregon, entitled "The Black Muslims and Religious Freedom in Prison," the Rev. Donald F. Sheehy, O.P. L.L.B., Catholic Chaplain of the District of Columbia Department of Corrections, noted at the beginning of his address: (pages 66–67)

"At the very beginning it would be well to make one point emphatically clear—the prison community is not the community of the free world. This is an essential distinction that many fail to make with disastrous results. While both communities are composed of human beings with likes and dislikes, with diverse personalities and backgrounds, the problems inherent to each are unique. The community of the free world has a built-in escape valve in the unrestricted movement of its members. As a result those who find themselves approaching the brink of violent action can unrestrainedly turn to innumerable other activities. Not so in a prison. Generally

speaking the prison community is composed of irresponsible and emotionally immature individuals who have been deprived of their freedom of movement by an order of the court as a punishment for some particular crime. But man is a social animal and is not created to be involuntarily deprived of his free movement. If he were, its deprivation would not be a punishment. Thus the essential problem of the prison community is that of maintaining an orderly institution which confines and houses those who have a natural and acquired abhorrence of confinement and a repulsiveness for the authority keeping them confined."

After reviewing the record and briefs filed in this case and studying the cases cited, it is clear to me that any case which deals with religious freedom in prison presents inherent problems because of the accepted rehabilitative[5] nature of religion, yet with the necessity of restricted movement within a punitive (or perhaps it would be proper to say "correctional") institution. An individual's constitutionally-guaranteed rights must be protected on the one hand; yet on the other, a prison has to be administered effectively; I must frankly admit that there is no simple solution; each case must be decided on its own merits within the framework provided by the legal principles involved.

Respondents have contended that the Black Muslim beliefs and teachings are not a religion. Some plausible arguments are made in support of their contention, but it is now clear this court cannot—or should not—undertake to define or rule on what is or what is not a religion. The United States Supreme Court in *Fowler v. State of Rhode Island,* 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953) has fully determined the point, where at the pages noted, the court said:

"* * *, it is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment. Nor is it in the competence of courts under our

---

[5] See citation of 11 *Del. C.* Sec. 6501, as amended by 54 Del. Laws, Ch. 349, supra, in footnote on page 555.

constitutional scheme to approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings. Sermons are as much a part of a religious service as prayers. They cover a wide range and have as great a diversity as the Bible or other Holy Book from which they commonly take their texts. To call the words which one minister speaks to his congregation a sermon, immune from regulation, and the words of another minister an address, subject to regulation, is merely an indirect way of preferring one religion over another. That would be precisely the effect here if we affirmed this conviction * * *. Baptist, Methodist, Presbyterian, or Episcopal ministers, Catholic priests, Moslem mullahs, Buddhist monks could all preach to their congregations in Pawtucket's parks with impunity. But the hand of the law would be laid on the shoulder of a minister of this unpopular group for performing the same function."

This constitutional protection is not restricted to orthodox religious practices any more than it is to expressions of orthodox economic views, *Follett v. Town of McCormick, S. C.,* 321 U.S. 573, 577, 64 S.Ct. R. 717, 719, 88 L.Ed. 938 (1944); it includes freedom of religious belief and embraces the right to maintain religious theories which may be regarded as rank heresy to those who follow orthodox religious teachings, *United States v. Ballard,* 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944). At the noted pages, the majority opinion (per Douglas, J.) observed:

"* * *. 'The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.' * * *. The First Amendment has a dual aspect. It not only 'forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship' but also 'safeguards the free exercise of the chosen form of religion.' * * *. 'Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be.' * * *. Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. * * *. It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. Men

may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others.

"Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law. Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representation. The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views. The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain. The First Amendment does not select any one group or any one type of religion for preferred treatment. It puts them all in that position. * * *. As stated in *Davis v. Beason*, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637. 'With man's relations to his Maker and the obligations he may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted, provided always the laws of society, designed to secure its peace and prosperity, and the morals of its people, are not interfered with.' "

In light of these pronouncements and the views expressed on March 8, 1965 in *United States v. Seegers*, 380 U.S. 163, 85 S.Ct.

850, 13 L.Ed.2d 733, I am constrained to rule the Black Muslim beliefs, held by the relators, constitute a religion.[6]

An important factor in this case is that the General Assembly has seen fit, in the exercise of its practically unlimited constitutional power and discretion, 1897 Const. Art. II, Sec. 1, *Del. C.* Ann.; State ex rel. *Craven v. Shaw,* 11 Terry 193, 199, 126 A.2d 542, 546 (Super. Ct. 1956) aff'd. 11 Terry 365, 370, 131 A.2d 158, 161 (Sup. Ct. 1957), to enact legislation, see pages 555, 556, supra, placing the custody, supervision and care of prisoners, sentenced by the courts of this state to terms of imprisonment, in an Executive Body, i. e. the State Board of Corrections, now the Department of Corrections, 72 C.J.S. Prisons Secs. 2, 5, 41 Am. Jur.—Prisons and Prisoners—Sec. 4.

Fundamental principles of constitutional law apply, and courts must recognize that they cannot invade or transgress into fields of government which the Constitution of this state has vested in the Executive Branch of our State Government. See State ex rel. *Biggs v. Corley,* 6 W. W. Harr. 135, 153, 172 A. 415, 423 (Ct. in Banc. 1934).

Each of the three branches of Government has, under and by our Constitution, been assigned certain given powers, and each branch of our Government must respect the power given to the other two branches of Government. In this particular area of Governmental administration, i. e. penal institutions, it is necessary or assumed that those who are put in charge have a given expertise. For that reason the judiciary is loathe to interfere with their decisions or sit in judgment on their decisions made in the administration of the facilities placed in their charge. To warrant this court to sit in judgment on the State Board of Corrections or its officers or agents, a strong showing must be made that their actions and conduct have been so arbitrary and capricious as to amount to an abuse of discretion or that it be shown

---

[6]See, however, In re Ferguson, 55 Cal. 2d 667, 12 Cal. Rptr. 753, 361 P.2d 417, cert. den. 368 U.S. 864, 82 S.Ct. 111, 7 L.Ed. 2d 61 (1961); and compare *Cooper v. Pate,* 324 F.2d 165 (C.C.A.7, 1963) and *Williford v. California,* 217 F. Supp. 245 (N.D. Cal. 1963).

they have, by their decisions, deprived inmates of their constitutional rights or infringed upon them in some respect. The substance of the holding of *DeMoss v. Rhodes,* 11 Terry 445, 133 A.2d 918 (Super. Ct. 1957) is applicable here. I, therefore, rule this court has only such supervisory powers over the administration of our penal institutions, as involve an arbitrary and capricious abuse of discretion by the prison authorities or where it is clearly shown there has been a deprivation or infringement of constitutional rights of inmates.[7]

Alluding again to "religious freedom" of inmates of a correctional institution, I once more quote from Chaplain Sheehy's address[8] in which he pointed out: (page 68)

"Restrictions must necessarily be placed on the inmates of the prison community just as certain restrictions must be placed on the members of the free community, E. g. Driver's license, barber's license, traffic lights, parking regulations, etc. The restrictions insure the well-being and the orderly running of the community as a whole and are not intended to be punitive as such to any individual. Similarly the prison authority must promulgate certain rules and regulations to fulfill the very purpose of its existence. The problem arises when one of those rules or regulations violates, actually or allegedly, one of the basic rights guaranteed by the Constitution of the United States. Here we might well ask the question—Is the prisoner entitled to any constitutional rights in general and is he entitled to 'religious freedom' in particular as guaranteed by the First Amendment?"

At a subsequent portion in his address, Chaplain Sheehy cogently observes: (pages 68—69)

"The real problem arises when a prisoner alleges that his constitutionally-guaranteed right of 'freedom of religion' has been

----

[7] 110 U. of Pa. Law R. 985, Constitutional Rights of Prisoners and see 62 Col. L.R., Black Muslims in Prison: of Muslim Rites and Constitutional Rights.

[8] Supra, page 562.

violated. Religion, in and of itself, is generally accepted to have certain rehabilitative influences[9] on an individual. In prison particularly then, where rehabilitation, discipline and instruction are an intimate part of its very raison d'etre, a man should be encouraged to exercise his right to worship as he sees fit. Should prison authorities bend over backwards to encourage religious freedom; What is the actual extent of this religious freedom; Furthermore, when such religious freedom seems to be in conflict with the Order of the court or prison discipline, should the prison authorities wink at such conflicts? Herein lies the *real* problem of the prison warden."

Designedly or otherwise, it is obvious those who are convicted of a serious crime should be deprived of some rights. Otherwise the time they spend in prison would not be a punishment. The question is—what rights should be restricted or even taken away entirely? Our statutes restrict those rights demanding of their very nature free movement of the body. Thus it would seem that the primary punishment of a prison is movement. A natural consequence would seem to be that the prisoner is entitled to those same rights as any other citizen which are not in conflict with the order of the court restricting the free movement of the body.

Again, I refer to Chaplain Sheehy's address—where he correctly points out: (page 69)

"In any religious sect four basic elements can always be found: 1) *study* as a means to improve one's knowledge of the Supreme Being and of the particular religious sect involved; 2) *profession* of that religion as a way of personal salvation; 3) *practice*, consisting of the various sets of prayers and religious observances which an adherent should perform with regularity; and 4) *public religious worship* by which the members of a particular religious sect come together and worship in a public manner. Are any of these in conflict with the orderly and safe running of a penal institution? What restrictions, if

———

[9]See, f.n. 5, supra, page 562.

any, can the prison authority legally place on any of the above four elements? Do such restrictions violate a prisoner's constitutional right to freedom of religion?

"It is important to realize that laws are made for the majority of men. There is no separate code of law for the inmates of a penal institution. Nor is this desirable. Thus we must look to the laws of the free community for the necessary guidelines in solving our problem. Yet herein lies another problem. Although written for the majority of men, laws have their application to particular cases within a particular set of circumstances. This must never be lost sight of, especially when applying the general law to a specific case which has as its setting the prison community with its inveterate and unique conumdra unintelligible to the "free world.' "

After reviewing a series of cases distinguishing freedom of religious beliefs and freedom to practice one's religion, Chaplain Sheehy proceeded to state in his address, pages 70-71:

"From the above decisions it is obvious that the state may impose restrictions upon religious practice. The question is 'WHEN'? Is there any TEST for the lawful imposition of restrictions? *Generally it can be said that when the religious beliefs lead to practices which contravene and violate the law of the land, such "beliefs must yield and be subordinate to such law,* for freedom of action in following one's concept of religion is subject to regulation for the protection of society. It must be remembered that a government is for the orderly running of society. To do so that government must protect itself from assault both from within as well as from without, and must also protect the rights of the individual members of that society. As a result there are times when an individual right must yield to a greater good. e. g. Conscription to preserve our national and individual liberty; traffic laws; the payment of an income tax; etc.

"Freedom of religion as intended by those who wrote the state and federal constitutions means the right of an individual to entertain any desired religious belief without interference from the state.

However, the right of religion does not mean that acts inimical to the peace, good order and the morals of society, as determined by the Legislature and the courts, may go unpunished because of what some particular group may call religion. For freedom of religion is absolute only as long as public morals, public health, public safety and convenience are observed. *'Freedom of religion' embraces the concept of freedom to believe and freedom to act, the first of which is absolute, but the second of which remains subject to regulation for the protection of society.* From all of the foregoing cases, it would seem that the Government has the right (and I might add the obligation * * *) to restrict any religious practice which either contravenes the existing law of the land or is detrimental to the common good of society as a whole." (Emphasis supplied)

Since I have not been able to find any discriminatory practices against relators as to their religious beliefs but have found they have been denied equal protection of the laws as to (1) not being provided the opportunities to "practice" their religious beliefs and (2) wearing of their religious symbols, there is little reason to go further.

The respondents, however, argue that the case at bar presents a situation that calls for the invoking of the "Clear and Present Danger Test," see *West Va. State Board of Education v. Barnette,* 319 U. S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943)[10] where it was said:

"* * *. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth

---

[10]See also *United States v. Korner,* 56 F.Supp. 242 (Dist. Ct. Cal.) stating (pp. 246–248) the guarantee of religious liberty is subject to a limited restraint *tolerated* by the Constitution under the clear and present danger doctrine, and see *Cantwell v. State of Conn.,* 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). See further *Dennis v. United States,* 341 U.S. 494, 510, 71 S.Ct. 857, 865, 95 L.Ed. 1137 (1951) where Judge Learned Hand's reformulation, 183 F.2d 201, 211–213 (1950) of the test was adopted by the Supreme Court.

is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case."

Respondents seem to think this should be a reason to deny relators the right to hold their religious exercises and have and wear their religious symbols—such as are accorded to other inmates at the N.C.C.I.

In our case it has been made clear that relators have been denied equal protection of the laws and I find no authority which permits the application of the "Clear and Present Danger Test" when the "equal protection of law" has been denied, under the circumstances here presented. It is true that the equal protection clause is found in Section 1 of the Fourteenth Amendment to the Federal Constitution, but the rights involved and which I consider must receive equal protection, stem from the First Amendment to the Federal Constitution. In my judgment the right to equal protection of law is almost an absolute right, always to be respected, but see *Dennis v. U. S.*, supra.

I have noted at pages 5/6, 7, 16/17, supra, that relators have not been permitted to exercise certain constitutional rights enjoyed by other inmates at the N.C.C.I., Catholic and Protestant. It is these practices, accepted by those in charge[11] which cause me to refuse, at

---

[11]I entertain no thought or belief that there was any conscious or deliberate denial of equal protection of laws by respondents. They had been following an

this time, to apply the test urged by respondents.

The holding of *Brown v. McGinnis,* 10 N. Y.2d 531, 225 N. Y.2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791 (N.Y.Ct. of App., 1962) represents my views in the situation presented by respondents' arguments. In that case Brown, alleging himself to be an inmate of a New York State Correctional Institution, sought an order of mandamus against the respondent, Commissioner of Corrections for New York, to permit petitioner "free exercise of his religion." In his petition, Brown alleged:

"* * * that he 'is of the Islamic faith by religious choice and profession and seeks spiritual advice, ministration and religious services of this faith from the local temple of Islam, located at 102 West 116 Street, New York, New York * * *. * * * that respondent 'does not allow petitioner religious services and spiritual advice and ministration from recognized clergyman of his profession and choice,' and that he and his coreligionists are 'forced to hold religious services in the prison yard.' "

The respondent set up in his answer, as an affirmative defense—

"* * * that the local temple of Islam whence petitioner seeks spiritual advice is headed 'by one Malcolm X. Little who, according to the records of the New York State Department of Correction, has a previous criminal record.' "

Respondent stated further:

"* * * that in 'the interests of safety and security of the

estabushed practice, accepted by all for many years. They were brought face to face with a somewhat phenomenon. Before they could meet to consider the problem presented by relators' demands, relators started their suit. I doubt seriously the wisdom of respondents having waived their rights to have had an administrative consultation and the opportunity of considering relators' demands before the suit was heard and briefs filed. On another occasion—if one should arise—it is my suggestion that the Department of Corrections consider such matters with administrative deliberation and make their determination before looking to the courts to act and determine the course to be taken.

institution concerned and a matter of long standing policy, the allowing of inmates to communicate with or to be ministered to by a person with a criminal background would not be consistent with the good administration of this institution.' * * *.' "

The Trial Court dismissed the petition and the Appellate Division affirmed, whence an appeal to the New York Court of Appeals.

The Commissioner of Corrections argued before the Court of Appeals:

"* * * that the potential dangers inherent in permitting the dissemination of their beliefs among the prison population warrant the restrictions imposed. * * *.' "

The majority opinion rejected this argument, saying:

"* * *. While such potential dangers, if realized, may justify the curtailment or withdrawal of petitioner's qualified rights, mere speculation, based upon matters dehors the record, is insufficient to sustain respondent's action."

It may be entirely possible that there are "potential dangers" in permitting relators, in the case at bar, the right to practice their religious beliefs and to wear their religious insignia, but I do not believe that we should start with the assumption that trouble necessarily will result from relators being permitted to exercise their rights. If and when they do violate the discipline and applicable rules and regulations, they can be punished if the proven facts justify. I know of no reason to deny the relators the equal protection of the laws, even if it is feared they might hereafter abuse the rights herein recognized.

I note in closing that an essential and integral part of the right to freely exercise one's religion, as protected by federal constitution, includes the right to select the clergy and to determine their essential qualifications, *Kedroff v. St. Nicholas Cathedral,* 344

U.S. 94, 116, 73 S.Ct.R. 143, 154, 97 L.Ed. 120 (1952). Respondents will not, I am sure, assume the authority to fix arbitrary standards for clergymen who may seek to visit inmates of our state penal or correctional institutions and provide them religious guidance.

The effect of this opinion can only be carried out by directing the respondents to permit relators to exercise the same rights and privileges which are accorded other inmates of the N.C.C.I. The appropriate manner by which this should be carried out is by the adoption and promulgation of rules and regulations applicable to all inmates (see concurring opinion of Chief Judge Desmond of New York Court of Appeals in *Brown v. McGinnis,* supra). Such rules and regulations should provide for necessary security and disciplinary measures so that peace and tranquility will prevail at the N.C.C.I. after the rules and regulations are made effective and inmates be permitted to enjoy equal protection of the laws.

An appropriate order may be submitted effectuating the views herein expressed.